**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| ORGANIZED COMMUNITIES AGAINST DEPORTATIONS, IMMIGRANT DEFENSE PROJECT, and CENTER FOR CONSTITUTIONAL RIGHTS, | |
| Plaintiffs, | Case No. 21-CV-2519 |
| v. | |
| UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT, | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

In this action brought under the Freedom of Information Act, 5 U.S.C. § 552, Plaintiffs Organized Communities Against Deportations, Immigrant Defense Project, and Center for Constitutional Rights, (collectively, "Plaintiffs") sue United States Immigration and Customs Enforcement ("ICE") to compel ICE to produce records relating to its "Citizens Academy" programs. The parties have filed cross-motions for summary judgment, [67], [75]. For the reasons explained below, the Court grants in part, and denies in part, the parties' motions, without prejudice.

## I.      Factual Background[1]

Plaintiffs are non-profit advocacy organizations dedicated to protecting immigrants' rights, [80] ¶¶ 3–5. ICE is the principal investigative arm of the Department of Homeland Security and is generally responsible for immigration enforcement. [69] at 2, ¶ 4. The parties' FOIA dispute concerns records relating to ICE's "Citizens Academy" programs. *Id.* at 1, ¶ 1; [80] ¶¶ 1, 10.

### A.      Citizen Academy Programs

"Citizens Academy" programs are outreach programs designed to educate selected community leaders and members of the public on ICE's mission and how the agency enforces immigration and customs laws. *Id.* Individuals apply to participate in these programs and, if selected, undergo a background check. [82] ¶ 1. Many Citizens Academy participants have had notable and unique job titles with prominent employers. *Id.* ¶ 60. Each Citizens Academy program focuses on a designated component of ICE. In 2012, ICE launched its first roll-out of "Citizens Academy" programs, which gave participants an inside look into ICE's Homeland Security Investigations ("HSI") component. [80] ¶¶ 9–10. ICE implemented HSI Citizens Academy programs in San Juan, New York, Tampa, and Los Angeles. *Id.* at ¶ 9.

In April 2019, ICE announced a "national roll-out" of the program, and in July 2020, ICE publicized the first Enforcement and Removal (ERO) Citizens Academy, to take place in Chicago. *Id.* ¶¶ 9, 11. ICE planned to model the Chicago Academy upon

---

[1] The Court draws the facts from Defendant's Local Rule 56.1 statement of material facts [69], Plaintiffs' response to Defendant's statement of material facts and statement of additional facts [77], Defendant's response to Plaintiffs' statement of facts [80], Defendant's statement of additional facts [81], and Plaintiffs' response to Defendant's statement of additional facts, [82].

the HSI programs, such that it would provide participants with insight into ERO's mission and activities.[2]  *Id;* [69] at 2, ¶ 9.

### B.    Plaintiffs' FOIA Request

Shortly after ICE announced the Chicago Academy, on July 16, 2020, Plaintiffs sent ICE a FOIA request seeking "information related to 'citizen's academies' operated by ICE." [69] at 3, ¶ 12; [80] ¶ 1.  Plaintiffs requested five categories of information: (1) training and orientation material for the Citizens Academy programs; (2) staffing records and data for all Citizens Academy programs since January 1, 2016; (2) records or data for ICE's 2019-2020 national budget for all Citizens Academy programs; (4) records and data regarding program invitees and attendees; and (5) records listing the types of tactical equipment used by and/or demonstrated to Citizens Academy participants during any program since January 1, 2016.  [1-1].  Although the request broadly sought this information for all "past, present, and future Citizens Academies," Plaintiffs specifically requested records for the "upcoming Chicago, IL citizens academy run by ICE and/or any of its subcomponents," "the ICE HSI citizens academy held in New York in 2017," and "the HSI citizens academy held in Los Angeles, CA." *Id.*

After having received no documents and having exhausted the administrative process, Plaintiffs brought this lawsuit on May 11, 2021.  [80] ¶ 2; [1].

---

[2] ERO is responsible for the arrest and removal of aliens, managing ICE's detention operations, and providing medical and mental health care to people in ICE custody.  [69] at 3, ¶ 14.

### C. ICE's FOIA Protocol & Searches

ICE's FOIA Director, Fernando Piniero, provided a declaration discussing the agency's protocol for processing FOIA requests. *See* [69] at 12–28. According to Piniero, when a request comes in, ICE's FOIA office identifies which program offices are reasonably likely to possess responsive records and tasks those offices with conducting the requisite searches. *Id.* at 3, ¶ 13–14. ICE staffs its program offices with a designated point-of-contact, who is responsible for communicating with the FOIA office. *Id.* at 15, ¶ 15. Based on the point of contact's experience, he or she will send the request, along with any instructions, to the employees or component offices within that program office who are reasonably likely to possess responsive records; those individuals or offices then search their file systems in locations reasonably likely to contain responsive records. *Id.* ¶¶ 15–16.

The determination of whether a particular location must be searched in response to a FOIA request depends upon how a particular employee maintains his or her files. *Id.* ¶ 17. ICE program offices and employees use various systems and methods to maintain records, including individual hard drives, the office's shared drive (if the office uses one), DVDs, CDs, and USB devices. *Id.* Employees store Microsoft Outlook email files in PST files on their email accounts, on their individual drives, or on their office's shared drive. *Id.* at 16, ¶ 18.

The ERO has its own approach to processing FOIA requests. In that office, a point of contact in ERO's Information Disclosure Unit "reviews the substance of the request" and based upon the point of contact's expertise and knowledge of the

program officers' activities, determines whether the ERO's Information Disclosure Unit can search for records, or "whether it is necessary to forward the FOIA request to other individuals or component offices to conduct searches of file systems that would be reasonably likely to have responsive records." *Id.* at 17–18 ¶¶ 25.

Once the searches are complete, the employees and component offices provide potentially responsive records to the point-of-contact, who then turns them over to the FOIA office. *Id.* at 15, ¶ 16. The FOIA office then reviews the records for responsiveness and determines whether any FOIA exemptions apply. *Id.*

Here, when ICE received Plaintiffs' request, ICE's FOIA office initially determined that its HSI and ERO components—the components that were the focus of its Citizens Academy programs—were the two components likely to possess responsive records, [69] at 3, ¶ 13. Sixty-seven HSI officers conducted a comprehensive search of the component's shared drive[3] and their sent and received emails.[4] *Id.* at 20, ¶¶ 36. This search revealed 5,500 pages of potentially responsive

---

[3] HSI searched the component's shared drive using the following search terms: "Citizens," "Citizens Academy," "Citizen's Academy," "Citizen Academy," "Academy," "ICE Citizen Academy," "ICE Citizens Academy," "HSI Citizens Academy," "Citizens Academy Training," "Citizens Academy Schedule," "Use of Force," "Citizen's Academy (CA)," "2019 Class," "Invitation." "Participants," "Staff," "Training," "Presentation," "Agenda," "Memo," "Receipts," "Procedures," "Equipment," and "CPI PSA." [69] at 6, ¶ 28.

[4] HSI also searched the component's sent and received emails using the following search terms: "Citizens," "Citizens Academy," "Citizen's Academy," "Citizen Academy," "ICE Citizen Academy," "ICE Citizens Academy," "Citizens Academy Denver," "ICE Citizens Academy," "HSI Citizens Academy," "Citizens Academy Training," "Citizens Academy Schedule," "Citizens Academy Nomination," "certificates," "tent cards for participants," "Use of Force," "Citizens '19," "Citizens 2019," "Academy 2019," "Academy 2020," "Citizens Academy 2021," "Academy 2021," "Citizens '20," "Citizens '21," "Scenarios," "Participants," "PCTW," "Nominees," "Citizen's Academy (CA)," "2019 Class," "Invitation," "Staff," "Training," "Presentation," "Agenda," "Memo," "Receipts," "Procedures," "Equipment," "HSI Miami," and "Staffing." [69] at 6, ¶ 29.

records. [69] at 7, ¶ 30. ERO deferred the FOIA request to the Office of Public Affairs ("OPA")[5] and Office of Partnership and Engagement ("OPE"), and ICE's FOIA office thus tasked those offices with searching for responsive records. [69] at 3, ¶ 8; [82] ¶ 57.

On July 27, 2020, the OPA asked Plaintiffs for clarification regarding the scope of their request. [69] at 3, ¶ 10. Plaintiffs responded that they were "requesting records regarding all citizen academies ICE, or any of its subagencies (such as HSI), has run since January 1, 2016 in 'any jurisdiction' including the academies run in New York in 2017, Los Angeles in 2016, and the upcoming academy planned for Chicago in 2020." *Id.* To satisfy this request, OPA searched its shared drive[6] and OPA's sent and received emails[7] using a variety of search terms, including "Citizen," "Academy," "Citizens Academy" "Citizen's Academy" and "Citizens' Academy." *Id.* at 5, ¶¶ 22–23. These searches produced 1,113 pages of potentially responsive records, which OPA sent to ICE's FOIA office. *Id.* ¶ 24. The OPE likewise conducted a search of the office's shared drive and OPE's sent and received emails using a variety of

---

[5] OPA is ICE's "public face," and is dedicated to fostering an understanding of the agency's mission through outreach to employees, the media, and the general public. [69] ¶ 17. OPA operates the Citizens Academy program. *Id.* ¶ 10.

[6] OPA searched its shared drive with the following search terms: "Citizen," "Academy," "Citizens Academy," "Citizens' Academy," "HSI Citizens Academy," "DHS Academy," "Graduation Ceremony," "Citizen Academies," "presentations," "materials," "costs," "invites," and "certificates." [69] ¶ 22.

[7] OPA also searched the office's sent and received emails using the search terms: "Academy," "Citizens Academy," "Citizen," "Citizen's Academy," "Citizens' Academy," "HSI Citizens Academy," "DHS Academy," "Graduation Ceremony," "Citizen Academies," "national budget for all ICE citizen academy programs," "training and orientation materials distributed for each session and/or class," "staffing records and data for all ICE citizen academy programs," "ICE policies or protocols for how it selects academy applicants," "tactical equipment used by and/or demonstrated to citizens academy participants," "presentations," "materials," "costs," "invites," and "certificates." [69] ¶ 23.

search terms.[8] *Id.* at 7, ¶¶ 25–26. OPE's searches produced 343 pages of potentially responsive records, which OPE likewise sent to ICE's FOIA office. *Id.* at 8, ¶ 27.

On July 16, 2021, after Plaintiffs initiated this lawsuit, ICE's FOIA office tasked the ERO again to search for records. [69] at 18, ¶ 27. Again, ERO deferred to OPA and OPE. *Id.* In February 2022, nineteen months after Plaintiffs submitted their FOIA request, ICE began producing documents to Plaintiffs. [80] ¶ 12. Plaintiffs asked ICE to prioritize the production of budget records and records pertaining to the Chicago ERO Citizens Academy and from ICE's field offices in New York and Puerto Rico, and ICE agreed to do so. *Id.* ¶ 13.

In September 2022, Plaintiffs identified unproduced records from the Chicago field office of the ERO, including a publicly released letter,[9] not addressed to any particular recipient, but signed by the Chicago Field Office Director, Robert Guardian. [80] ¶ 18; [82] ¶ 54. The letter solicited applications for the upcoming Citizens Academy program and directed interested applicants to submit an email to Communications Relations Director, Manda Walters. [82] ¶ 54. After learning of this letter, ICE reported, in a December 2022 Joint Status Report, that it would follow up "to determine whether the office possessed responsive records." [80] ¶ 19.

---

[8] OPE searched the office's shared drive using the search terms: "Citizen," "Citizen's," "Citizen's Academy," "Citizens Academy," "Citizens Academy Atlanta," "Citizens," "HSI Citizen's Academy," "Citizens Academy, CA," "Academy," "HSI Tampa," "HSI Citizens," "HSI Citizen Academy," "Citizen Academy," "HSI's Citizen Academy," "James Manning," "Sonia Thomas," and "Rachel Yong Yow." [77] ¶ 25. Using those same search terms, plus "Maricruz" and "Taum," it also searched the office's sent and received emails.

[9] The letter states that all applications were to be submitted to Manda Walters, Community Relations Officer by email at CommunityRelations.Chicago@ice.dhs.gov. [77-6].

In turn, on January 3, 2023, the ERO received another supplemental FOIA request from Plaintiffs, and this time the ERO conducted its own search. [69] at 18, ¶ 28. A Management and Program Analyst at ERO searched the office's shared drive using the terms "Academy," "Citizens Academy," and "Citizens," and additionally searched the analyst's own sent and received emails[10] using those same search terms. *Id.* These searches produced no responsive records. [69] at 4, ¶ 20. Following this search, ICE represented in a January 27, 2023 Joint Status Report that the ERO field office in Chicago "searched for responsive records and determined that it has none." [80] ¶ 20.

Ultimately, over the course of 17 productions, ICE produced 6,956 pages of responsive records. [69] at 7, ¶ 31. These records included email communications between ICE employees regarding ICE's Citizens Academy program, media requests for information about the program, program materials, and personally identifiable information of civilian nominees and participants in the program. *Id.* at 21, ¶ 41. Few documents, however, contained budgetary information. [80] ¶ 22. ICE withheld or redacted some records as exempt from disclosure under FOIA exemptions 5, 6, 7(C) and 7(E), the bases of which are set forth in Piniero's declaration and the accompanying *Vaughn* index. [69] at 7, ¶¶ 32, 33. ICE did not withhold any non-exempt information on the ground that it was non-segregable. *Id.* at 10, ¶ 46.

---

[10] In their responses to Defendant's statement of facts, [77] ¶ 20, and to Defendant's statement of additional facts, [82] ¶ 55, Plaintiffs do not dispute ICE's stated fact, that a management and program analyst at ERO searched "the office's shared drive and emails," because "this paragraph characterizes the internal actions of ICE, and accordingly Plaintiffs are without knowledge to admit or deny." [77] ¶ 20; [82] ¶ 55. As explained below, however, Piniero's declarations confirm, only that the analyst searched "*his/her* own sent and received emails." [69] at 18, ¶ 28 (emphasis added).

Principally, ICE claims it has searched all locations likely to contain records responsive to Plaintiffs' FOIA requests and disclosed all non-exempt information. *Id.* ¶ 47. And Plaintiffs claim that three years later, they have yet to see crucial information to which they are entitled under FOIA about ICE's Citizens Academy programs. [80] ¶ 31. Each claims entitlement to summary judgment.

## II.    Legal Standard

Summary judgment is proper if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to a material fact exists when, based upon the evidence, a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To show a genuine dispute as to a material fact, the non-moving party must point to "particular materials in the record," and cannot rely upon the pleadings or speculation. *Olendzki v. Rossi*, 765 F.3d 742, 746 (7th Cir. 2014).

Cross motions for summary judgment are treated separately under the standards applicable to each. *See McKinney v. Cadleway Properties, Inc.*, 548 F.3d 496, 504 n.4 (7th Cir. 2008). In reviewing cross motions for summary judgment, the court examines the record and draws "all reasonable inferences in the light most favorable to the party against whom the motion was filed." *Yeatts v. Zimmer Biomet Holdings, Inc.*, 940 F.3d 354, 358 (7th Cir. 2019).

## III.    Discussion

The Freedom of Information Act demands that agencies "make ... records promptly available to any person" who submits a request that "(i) reasonably describes such records and (ii) is made in accordance with [the agency's] published rules." 5 U.S.C. § 552(a)(3)(A). The Act is "broadly conceived," and its "basic policy" is in favor of disclosure. *N.L.R.B. v. Robbins Tire & Rubber Co.,* 437 U.S. 437 U.S. 214, 220 (1978). Agencies are, however, permitted to withhold records under nine statutory exemptions and three special exclusions for law-enforcement records. *See* 5 U.S.C. § 552(b)-(c). To satisfy its obligations under FOIA, an agency must conduct an adequate search for the requested records and must also adequately justify any material withheld from disclosure based upon FOIA's exemptions. *Bagwell v. U.S. Dep't of Just.,* 311 F. Supp. 3d 223, 228–29 (D.D.C. 2018). Plaintiffs allege that ICE has done neither. The Court addresses these challenges in turn.

### A. Adequacy of the Search

The Court first considers whether ICE's search was adequate. In assessing adequacy, the question is whether the "agency undertook a search reasonably calculated to uncover all relevant documents." *Henson v. Dep't of Health & Hum. Servs.,* 892 F.3d 868, 875 (7th Cir. 2018). FOIA requires the agency to make "a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Rubman v. U.S. Citizenship & Immigration Servs.,* 800 F.3d 381, 387 (7th Cir. 2015) (internal quotations omitted). The Court presumes the agency acted in good faith, and that presumption may be "bolstered by evidence of the agency's efforts to satisfy the

request." *Stevens v. United States Dep't of State*, 20 F.4th 337, 342 (7th Cir. 2021) (citing *Rubman*, 800 F.3d at 387) (internal quotations omitted). Whether a search for responsive records is "reasonable" for FOIA purposes "is a flexible and context-dependent," standard, and the adequacy of a search is judged by the methods rather than the fruits of the search. *Stevens,* 20 F.4th at 342; *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003).

At summary judgment, evidence that a search was reasonable and conducted in good faith normally comes in the form of "reasonably detailed nonconclusory affidavits." *Matter of Wade,* 969 F.2d 241, 249 n.11 (7th Cir. 1992). The affidavit must be "reasonably detailed, set forth the search terms used in electronic searches and the kind of search performed by the agency, and aver that all files likely to contain responsive materials were searched." *Henson,* 892 F.3d at 875 (quoting *Oglesby v. U.S. Dep't of Army,* 920 F.2d 57, 68 (D.C. Cir. 1990)). In response to an affidavit, the FOIA requester can present "countervailing evidence" suggesting a genuine issue of material fact exists as to the adequacy of the agency's search. *Rubman,* 800 F.3d at 387. Once the FOIA requester and agency have made their case, "if a review of the record raises substantial doubt" about the adequacy of the search, "particularly in view of well-defined requests and positive indications of overlooked materials, summary judgment" in favor of the agency is inappropriate. *Rubman,* 800 F.3d at 386–87.

Here, ICE relies upon the declarations of Fernando Piniero, ICE's FOIA Director, to establish the adequacy of its search for records. [69] at 12–28; [81] at 5

("Suppl. Decl."). As detailed above, the declarations describe ICE's standard procedure for responding to FOIA requests, and then outlines those processes as applied to Plaintiffs' request. [69] at 16–18, ¶¶ 21–28. With respect to each of the four ICE components searched, the declarations describe in detail the search terms used, indicate that ICE's search tool is not case-sensitive, and aver that "all locations likely to contain records responsive to Plaintiffs' FOIA Requests" were searched." *Id.* at 16–17, ¶ 22.

Plaintiffs argue that the search was inadequate because ICE failed to search key custodians at the ERO, noting that Piniero provides "no explanation" of "why a search of a single ERO analyst's emails" at the ERO Chicago Field Office was adequate. [76] at 6. In response, ICE does not contend that a search of a singular analyst's emails would have been adequate; instead, ICE states that Plaintiffs "are simply wrong about what ICE searched," because an ERO analyst searched the ERO Chicago *field office's* shared drive and [the field office's] emails, not only the emails of one particular analyst. [79] at 5 (citing Suppl. Decl. ¶ 55). Piniero's Supplemental Declaration suggests something different to the Court. [81] at 5–9. Regarding the ERO's supplemental search on January 3, 2023, Piniero cites to his initial Declaration ([69] at 18, ¶¶ 27–29), and states that the "analyst performed a search of the Chicago field office's shared drive as well as searching emails." [81] at 6–7, ¶ 5. But according to Piniero's initial Declaration, the analyst searched only "his/her own sent and received emails," [69] at 18, ¶ 28. Thus, reading these declarations consistently, it

appears that the ERO analyst searched only his or her own emails, not any one else's at the ERO.

Although searching only one analyst's emails does not render the search inadequate as a matter of law, here, ICE's failure to explain its apparent decision not to search any other email accounts at the ERO—particularly in light of record evidence that ICE employees discussed Citizens Academy programs and solicited applications by email,[11] casts doubt upon the adequacy of its search. *See Iturralde,* 315 F.3d at 315 (denying summary judgment where agency did not identify why the scope of defendant's search was limited to the files or personnel listed); *see also Oglesby,* 920 F.2d at 68 (an agency is "required to explain in its affidavit that no other record system was likely to produce responsive documents").

To fulfill its obligations under FOIA, an agency need not search locations unlikely to produce responsive records, but an agency "cannot limit its search to only one [location] if there are others that are likely to turn up the information requested," *Campbell v. U.S. Dep't of Justice,* 164 F.3d 20, 28 (D.C. Cir. 1998). In *Judicial Watch, Inc. v. U.S. Department of Justice,* the plaintiff sought "any and all" correspondence related to former FBI Agent Peter Strzok's assignment to Special Counsel Robert Mueller's investigation and his subsequent reassignment. 373 F.Supp.3d 120, 127 (D.D.C. 2019). The FBI decided to search only Agent Strzok's email account, defending the decision as "eminently reasonable" because he was the "named subject"

---

[11] For example, ICE employees discussed Citizens Academy programs by email, [77-5], and the ERO Chicago Field Office Director, Robert Guardian, directed interested applicants to apply to the Citizens Academy program by email, [77-6].

of the request. *Id.* The court disagreed and ordered the FBI to conduct additional email searches, reasoning that other people within the FBI likely would have discussed the assignment or reassignment via email without having shared those discussions with Strzok. *Id.* So too here.

As in *Judicial Watch*, the record here suggests that ERO employees' email accounts, likely to possess responsive records, may have been overlooked. Relatedly and compounding this concern, ICE did not act upon reasonable and obvious leads provided by Plaintiffs to discover relevant documents in the ERO. Agencies have an obligation to "follow through on obvious leads to discover requested documents." *Valencia-Lucena v. United States Coast Guard*, 180 F.3d 321, 315 (D.C. Cir. 1999). In December 2022, ICE reported that Plaintiffs identified a letter from the Chicago Field Office Director [77-6], soliciting applications for the ERO Chicago Citizens Academy by email, which suggested that the ERO Chicago Field Office possessed responsive records; accordingly, ICE stated that it would "follow up." [80] ¶ 19. Curiously, during ICE's "follow-up" search, ICE apparently did not search the email accounts (or any other files) of the Chicago Field Office Director, the Community Relations Officer to whom applications were to be submitted, *see* [77-6] or the email account of any ERO employee besides that of the single analyst. ICE's January 2023 report, stating that the ERO Chicago Field Office possessed no responsive records was based upon the limited search described above. [80] ¶ 20. And ICE has offered no explanation for its decision not to search these accounts.

In short, Pinero's declarations do not allow the Court to determine whether ICE conducted "an incomplete, perfunctory search" of the ERO, *Ancient Coin Collectors Guild v. Dep't of State*, 641 F.3d 504, 514 (D.C. Cir. 2011), and decided to "call it a day" when "it believed from the outset it was unlikely to find any records," *see Akel*, 578 F.Supp.3d at 97; or whether, ICE reasonably limited its search based upon its determination that additional email searches were unlikely to turn up the information requested. The apparent limited nature of ICE's search of ERO officers' emails, without further explanation, and in light of the evidence cited by the Plaintiffs,[12] raises a "substantial doubt" that ICE conducted a search reasonably calculated to uncover all relevant documents. *Rubman*, 800 F.3d at 387.[13] The Court thus denies ICE's motion for summary judgment on the adequacy of the search.

---

[12] At some point, ICE produced an email chain from July 2020 between members of ICE components and offices, including OPA and ERO discussing the roll out plan for the ERO Chicago Citizens Academy. *See* [77-5]. In that email chain, the members discuss a draft news release containing a Q&A section about the program, stating:

> Q: How many have applied? How many spots available?

> A: In the first week of the application window, launched July 2, we have received 20 applications. Due to limited space, the first class is expected to include 10 to 12 participants.

[77-5].

[13] *Compare, Cause of Action Inst. v. Internal Revenue Serv.,* 316 F. Supp. 3d 99, 109–10 (D.D.C. 2018) (granting summary judgment for IRS where declaration made clear that searching emails of Office of Disclosure employees was unnecessary given associate deputy director's representation that responsive records were unlikely to exist in Office of Disclosure), *with, Knight First Amend. Inst. at Columbia Univ. v. Centers for Disease Control & Prevention,* 560 F.Supp.3d 810, 825–26 (S.D.N.Y. 2021) (denying summary judgment where CDC provided no reason it did not search of inboxes of individuals identified by plaintiff which plaintiff reasonably contended may contain responsive documents), *and Valencia–Lucena*, 180 F.3d at 327 (reversing summary judgment for agency because agency's "failure to search the center it had identified as a likely place where the requested documents might be located clearly raises a genuine issue of material fact as to the adequacy of the agency's search").

Beyond the ostensibly deficient search of the ERO, the Court finds that ICE has otherwise demonstrated that it has met its obligations to adequately search for records under FOIA, and remains unpersuaded by Plaintiffs' other challenges based upon the record.

For example, Plaintiffs challenge ICE's decision not to search the Office of the Chief Financial Officer (OCFO), given its request to prioritize budgetary records. [76] at 7. Unlike with the agency's search of the ERO, however, the Supplemental Declaration explains that ICE did not search the OCFO for budgetary records because that office was in no way involved in the Citizens Academy program, and therefore was "not reasonably likely to have records responsive to plaintiffs' FOIA request." [81] at 7, ¶¶ 56, 58. Since ICE's Citizens Academy program "fell under the purview of the Office of Public Affairs (OPA) and Office of Public Engagement (OPE)," ICE searched those offices for responsive records. *Id.* ¶ 57. And the search of those offices was comprehensive, covering the offices' shared drives and sent and received emails. [69] at 4–7, ¶¶ 22–23, 25–26. As noted above, to satisfy FOIA, ICE need not search all its record systems, but it should explain why it believes the limits on its search are reasonable. *Oglesby,* 920 F.2d at 68. Here, ICE has provided a sufficient explanation, and Plaintiffs have provided this Court no countervailing evidence that ICE's search of the OCFO was inadequate.

Plaintiffs also take issue with the search terms, and search approach, ICE used. These challenges fare no better. Regarding search terms, Plaintiffs argue that there were "obvious and unexplained omissions" from ICE's search terms, such as

"Chicago" "New York" or Puerto Rico," even though Plaintiffs asked ICE to prioritize records from the Field Offices in those cities. [76] at 10. In addition, Plaintiffs claim that ICE custodians used search terms highly unlikely to yield responsive documents, such as searching OPA for "national budget for all ICE citizen academy programs." *Id.*

In fulfilling a FOIA request, agencies retain discretion in crafting a list of search terms they believe to be reasonably tailored to uncover responsive documents. *Liberation Newspaper v. Dep't of State*, 80 F.Supp.3d 137, 146–47 (D.D.C. 2015). Where an agency's search terms are reasonable, the Court will not "second guess the agency regarding whether other search terms might have been superior." *Id.*

ICE's search terms were reasonable. The agency's searches of all four components included the broadest search term "Academy," which would generate results encompassing *all* Citizens Academy records, including the more-specific subset of records for programs in Chicago, New York, or Puerto Rico. [69] at 17–18, ¶¶ 22–29. By contrast, searching for records containing the word "Chicago" would return "every single email containing the word, as opposed to records regarding Chicago's *citizens academy*." [79] at 8. In addition, the components also used multiple variations of the term "Citizens," including the singular ("Citizen") and the possessive ("Citizen's" or "Citizens' "), which would likewise capture more expansive results than Plaintiffs' proposed search terms. *Id.* On the whole, ICE's search terms concerned the relevant subject matter and were designed to uncover all responsive records; any additional search terms used would have been superfluous. *Liberation*, 80 F.Supp.3d

at 146. While ICE's use of the search term "national budget for all ICE citizens academy programs" was likely unproductive, to comply with FOIA, a search "need not be perfect, only adequate." *Stevens*, 2023 WL 2428839, at *6. This Court will not "micro-manage" the agency's search further. *See id.* (citing *Johnson v. Executive Office for U.S. Attorneys,* 310 F.3d 771, 776 (D.C. Cir. 2002) ("FOIA, requiring as it does both systemic and case-specific exercises of discretion and administrative judgment and expertise, is hardly an area in which the courts should attempt to micro-manage the executive branch.")).

Plaintiffs also argue that ICE employed a "haphazard" approach, using different search terms for different offices. [76] at 10. So long as the searches are designed to retrieve responsive documents, however, using varied search terms does not automatically undermine the adequacy of a search. *Immigrant Def. Project v. United States Immigr.,* 208 F. Supp. 3d 520, 529 (S.D.N.Y. 2016); *Fox News Network, LLC,* 739 F.Supp.2d 515, 534 (S.D.N.Y. 2010) ("there is no requirement that an agency use identical search terms in all of its offices"); *see also Judicial Watch,* 20 F.Supp.3d at 254 ("Though some agencies may choose to search for responsive documents in a centralized fashion using consistent search terms and techniques across various departments, nothing in FOIA's text or the relevant case law requires an agency to do so."). As noted above, all four ICE components used the search term "Academy," the broadest search term likely to return all responsive results, as well as varying forms of "Citizens." Thus, the inclusion by some components of narrower

search terms, designed to yield fewer documents, does not render the search inadequate.

Having determined that ICE's searches were reasonable and adequate in all respects, except for the search of the ERO as noted above, this Court orders ICE, by May 29, 2024, to conduct additional searches of the sent and received emails from: (1) ERO Chicago Field Office Director, Robert Guardian; (2) Community Relations Officer, Manda Walters; and (3) any other ERO employee that the agency determines is reasonably likely to have responsive records, and produce all resulting responsive documents located in that search.[14] Following the search, ICE shall prepare a supplemental affidavit describing the additional searches conducted of the ERO, and if any documents are withheld or redacted, ICE shall prepare and file a *Vaughn* index.[15] By June 12, 2024, the parties shall meet and confer and file a Joint Status Report addressing whether Plaintiffs contest any withholdings or redactions in ICE's supplemental production or whether Plaintiffs otherwise challenge the adequacy of ICE's supplemental searches.

Based upon the record discussed above, the Court denies Plaintiffs' cross-motion as to the adequacy of ICE's search to the extent it is based upon any other alleged deficiencies in the search.

---

[14] If, despite the ambiguity in Piniero's declarations, it turns out ICE has already searched the sent and received emails of the custodians ordered herein, ICE may indicate this in a supplemental affidavit, rather than conduct another search of these custodians.

[15] Plaintiffs' also challenge that ICE only searched the ERO Chicago Field Office's shared drive, and not the shared drive of any other offices. ICE should address this limitation in its supplemental declaration as well.

### B. Records Withheld by ICE

ICE withheld or redacted certain records under FOIA exemptions 5, 6, 7(C) and 7(E), and prepared a *Vaughn* Index[16] describing the bases for its withholdings and redactions. [77] ¶¶ 32–33. Plaintiffs challenge ICE's withholdings and redactions under exemptions 6 and 7(E). To satisfy its burden on the issue of withholdings, an agency must provide a "relatively detailed justification," specifying "the reasons why a particular exemption is relevant and correlates those claims with the particular part of a withheld document to which they apply." *People for the Am. Way Found. v. Nat'l Park Serv.*, 503 F. Supp. 2d 284, 295 (D.D.C. 2007) (internal citations and quotations omitted).

In assessing whether an exemption remains justified, this Court generally considers affidavits submitted by the agency, *Vaughn* indices, and any documents submitted for the Court's review. *Henson*, 862 F.3d at 875; *Stevens*, 20 F.4th at 344. Although not required in all cases, FOIA contemplates *in camera* review for courts to assess whether an agency's application of an exemption to withhold or redact information is justified. *See Solar Sources, Inc. v. United States*, 142 F.3d 1033,1040 (7th Cir. 1998) (citing 5 U.S.C. § 5552(a)(4)(B)); *DeFraia v. Cent. Intel. Agency*, 311 F. Supp. 3d 42, 50 (D.D.C. 2018) ("District courts have substantial discretion in deciding whether to review documents *in camera* . . .").

---

[16] A *Vaughn* index is a "comprehensive listing of each withheld document cross-referenced with the FOIA exemption that the Government asserts is applicable." *Solar Sources,* 142 F.3d at 1037 n. 3 (citations omitted). In preparing a *Vaughn* index, an agency must list the title of the document or category of documents, the date of the document, the author and recipient(s), a detailed factual description of the document(s), and the statutory exemption the agency is claiming to support nondisclosure." *Becker v. I.R.S.*, 34 F.3d 398, 401 n. 9 (7th Cir. 1994).

Here, the Court finds an *in-camera* inspection appropriate to determine whether ICE has properly invoked the FOIA exemptions. *See, e.g., Vidal-Martinez v. United States Dep't of Homeland Security*, 84 F.4th 732, 748 (7th Cir. 2023) (holding district court had adequate factual basis to evaluate ICE's withholdings where ICE provided court a detailed affidavit, a *Vaughn* index, and court reviewed 51 documents *in camera*). Therefore, by June 12, 2024, the parties shall select a reasonably sized "representative sample" of *contested* withheld or redacted documents from: (1) ICE's prior productions, (those which are the subject of the parties' cross-motions for summary judgment), and from (2) the supplemental production, if any, for the Court's *in camera* review. The sample should be organized by document type and claimed exemption, and should be hand-delivered to chambers. If appropriate, the Court will set additional case management dates relating to any renewed cross-motions concerning the adequacy of ICE's search of the ERO and the applicability of the FOIA exemptions. *See, e.g., North v. U.S. Dep't of Justice,* 658 F.Supp.2d 163, 176 (D.D.C. 2009) (allowing parties to refile motions for summary judgment where record was unclear as to the adequacy of the agency's search).

## IV.   Conclusion

As explained above, the Court grants in part, and denies in part, the parties' cross-motions for summary judgment. The Court finds ICE's search to be adequate in all respects except one and thus grants ICE's motion for summary judgment in part and grants Plaintiffs' cross-motion in part. ICE shall conduct the additional

searches of the ERO outlined herein by May 29, 2024. The parties shall file a Joint Status Report and provide the ordered sample of contested withheld or redacted documents by June 12, 2024. The Court reserves ruling on ICE's withholdings and redactions pending the supplemental production ordered herein and the Court's in camera review of the documents provided.

Dated: May 8, 2024                    Entered:

                                      John Robert Blakey
                                      United States District Judge